Mr. Zinn, when you're ready. Good morning, Your Honors. May it please the court, Matthew Zinn appearing on behalf of Appellants City of Carson and City of Carson Mobile Home Rental Review Board. At the outset, I want to wish Judge Graber a speedy recovery. And I'd like to reserve five minutes for rebuttals. Watch the clock, and I'll try to remind you. Thank you, Your Honor. Your Honors, no reasonable decision maker, whether fact finder or an adjudicator, could conclude that any of the three Penn Central factors support the verdict that the city's rent decisions here affected a regulatory taking of plaintiff's property. And I want to focus particularly on the first two, economic impact and reasonable investment expectations. Just to summarize, first, plaintiff failed to carry its burden of proving a severe adverse impact on the value of its entire property interest. The only relevant record evidence here is plaintiff's admission on cross-examination that the rent increase decisions increased the value of the park. There is plenty of evidence in this record of lost rental, for better or worse. And as I read the jury verdict and the instructions, the jury seems to have concluded that because of the two smaller rent increases than were sought, Colony lost approximately $3.4 million. I'm trying to figure out the relevance of that to the taking question. Because I've always, and I'll ask your colleagues the same question. It seems to me that when you look at a taking, you look at the value of a property before and the value of the property afterwards. I'm assuming that the value of the property before was $23.5 million, because that's what Mr. Goldstein paid for it. Is there any evidence in this record from which a finder of fact could find what the value of the property was after the regulatory action? The only evidence, again, your honor, is Mr. Goldstein's admission. Well, but that's not evidence. That's not evidence of what it was worth. So I'm trying to look at this record in the light most favorable to sustaining the verdict. And I'm trying to figure out whether there's any evidence in this record from which a rational finder of fact could find what the value of the property was after the regulatory action. No, your honor, there is no such evidence. Is the first prong of the Penn Central test independently sufficient to, in other words, if you don't meet the first prong, do we go on to the other two? I don't think you do need to go on to the other two, your honor. And there are a couple of cases. The Garneau case was a case in which the court found that there was no insufficient evidence of economic impact. And the Forest Properties case from the Federal Circuit is a similar situation. And I really think coming back to the Supreme Court's decision in Lingle, which reminds us about the fundamental purpose of regulatory takings analysis, makes clear that the economic impact of the regulation is just at the heart of the regulatory takings inquiry. Over what period of time do we look at the economic impact? These regulatory takings cases are sometimes kind of strange because the action taken is temporal as opposed to a rezoning that says you can never use it this way. How do we look at the regulatory impact temporarily? Well, your honor, that's the beauty of using the market value of the property, looking at the market value of the property before and after the actions. Because the market value with and without the regulatory restriction, the numerator and denominator of that famous fraction, that value capitalizes the full impact of the regulation over time. So could this, I'm not an economist, as President Bush once said, but could one perceive the value of property by looking at projected income streams from the property? Normally that's a method of valuation, is it not? Absolutely. But you have to, as the C-10 court held, if you're going to do that approach, you have to look at the value of the present value of the revenue stream over the entire useful life of the property, not over a tiny window of that useful life. This is a fee-simple interest in real estate. It's perpetual. And in fact, Mr. Goldstein testified that this was intended to be a long-term investment. So there's absolutely no basis for zeroing in on an artificially short window and looking at the impact during that short period. You wanted to address the investment-backed expectations. And I have a question about that. In rereading the record, I see that Mr. Goldstein said, well, the first time I applied for a rent increase, I asked them to consider debt service, and they didn't. Because we have a jury verdict, we don't know what the jury particularly found on this issue. And that's a separate problem you'll address in your briefs about who should be the decider. What do we do? Is that testimony enough to defeat his any investment-backed expectations, or is just the fact that the finder of facts should take into account? Are we speaking about the letter from his attorney? Right, right. There's evidence that when they applied, there's evidence only of this one rent increase application. And the increase application included debt service. The board apparently, and the request granted was much less because debt service apparently wasn't included in the board's decision. So I'm trying to figure out, there's that evidence in the record. What does it do to investment-backed expectations as a matter of law, not as a matter of fact? Because I don't know whether a finder of fact found it credible or didn't or not. Right. Well, Your Honor, I think to the extent it is relevant to reasonableness, to the question of reasonableness as a matter of law, I think it's because the attorney's advice was correct as a matter of law. In other words, the attorney was correctly reading the ordinance which established the rules for rent increases. And our position is consistently that you have to look at those existing legal rules in evaluating the reasonableness of expectations they establish. Yeah, well, we know that as a matter of California law, from our first ruling in this case, that either of the two methods of evaluation can be used and it doesn't violate state law. Right. But their argument seems to be, well, you really only used one for almost all the time. Right. And that's why I'm trying to hone in on this initial application and see whether or not that undermines that argument. Well, I think, Your Honor, that there is no precedent that I am aware of in which a plaintiff was found to have reasonable investment-backed expectations based on that experiential kind of evidence. And in fact, there's a couple. How others were treated? Yes. Particularly in a legal regime like we had here, where, as the court discussed in the first Colony Cove case, there was broad policymaking discretion invested in the rental review board to evaluate 11 factors. That focuses on the question I really wanted to ask you. Can one have reasonable investment-backed expectations based on other people's dealings with a board as opposed to one's own? I don't believe so. And frankly, I don't even believe that one's own dealings with the board are the basis for reasonable investment-backed expectations. I believe the law is the basis for reasonable investment-backed expectations. And this is not a situation where the rental review board is a court that develops a record of precedence over time and applies a sort of common law method of decision. The court looks at the facts, or excuse me, the board looks at the facts of each individual case, which are maybe radically different in different cases, and has to balance these many, in some cases, competing factors in coming to a conclusion. And again, there's no precedent that it's even possible to develop reasonable investment-backed expectations in that circumstance. And I want to direct the court's attention to this Apollo case from the Federal Circuit. This is a mining case in which this is the one where the government said, when they contracted initially, you can buy out the mortgage at some point. No, actually, that's the Assinaga case. I'm sorry, I got the two Federal Circuit cases confused. Yeah, there's certainly a host of Federal Circuit cases. The Apollo case was one in which the plaintiff purchased a bunch of property for mining. And there was a provision in the Surface Mining and Recovery Act that allows third parties to petition the government to designate certain properties as not suitable for mining. In other words, totally preventing mining of those areas. And the plaintiff in that case contended that based on its experience in this field, it believed that the agency wouldn't receive such a petition. And if it did, it would not accept such a petition. It would not act on it. It's very similar to what we have here. They were saying, well, we thought that the agency wouldn't exercise its discretion in that way. And thank you for correcting me on which case it was. But the difference in that case, isn't that a little bit closer to the National Railroad Passenger Corporation line of cases that say when you buy property, when you deal with the government, you recognize that you're subject to their statutes and you can't have any expectation other than that? And they can change the statutes from time to time and you may be stuck with it. That is true, Your Honor. But this is actually an easier case because we don't have that kind of a disruptive change, right? There was no change in the rules in this case. Well, we know that as a matter of law of this case. Absolutely. Can you address the Carson Gardens case? Put aside for a second its evidentiary value at trial of any, what relevance does it have to our decision making process today? I don't think it has any relevance to your decision, Your Honor. Because again, it did not establish the law. As I read it, it merely said, you must, board, you should do an analysis under both approaches. We're not going to tell you which one to adopt. And the board, for some reason, didn't do the analysis under one of the approaches. And the court slapped them and said, do it. That's right. And the Court of Appeal evidenced some skepticism about the Superior Court's original conclusion that the board was required to apply, was required to pass through the debt service. But the court said, we're constrained by the fact that that was a previous unappealed Superior Court judgment. And the matter before us currently is simply, did the city comply with that prior judgment? So putting aside the question of what the jury could have made of that as evidence, it doesn't tell us what the law is. Yeah, and I'm trying to figure out whether it could have given rise to investment-backed expectations on the part of Mr. Goldstein. No, I submit that it couldn't, Your Honor, because it was not a holding on the meaning of the ordinance. Well, there was a Superior Court ruling saying you had to do something. That's true. Could he have relied on that Superior Court ruling? Or would that reliance have been not good in light of the subsequent history of the case? I think, one, it's unreasonable to rely on an unappealed Superior Court decision at all. And two, given the admittedly dictum in the Court of Appeals decision that indicated that it looked askance at the Superior Court's prior decision, I don't see how you could possibly reasonably rely on that. I know there was some testimony in this record about the case, largely from Mr. Goldstein saying, I relied on it, and here's my interpretation of it. Was there any other evidence in the case? Did the judge allow evidence about the subsequent history of the case? The subsequent history of the, well, the opinion itself, the appellate opinion itself recited the evidence. Right, was the opinion put in evidence? Yes, Your Honor. So again, I think on reasonable investment-backed expectations, the question is, what does the law say? The jury was basically going to read this opinion and decide whether Mr. Goldstein's reliance on it was reasonable? That's, is that what happened? I think so, Your Honor. I think it's a fairly remarkable situation. Looking at that particular procedural posture of that case, I can imagine that many third-year law students might have trouble parsing what exactly was going on and what the precedential significance of that case was, let alone a jury that has no experience in judicial process and is obviously not in a position to understand those niceties. Who put the opinion in evidence? The plaintiffs. In your brief, you cite a number of several instances where they use the NOI method and did not permit, or did not take into account, interest payments. Yes, Your Honor. Yeah, again, yes, this was not, even if it were conceivable that if you had an agency, even if it were conceivable that you could rely on a sort of prior practice of an agency that's invested with discretion, I would submit that you would need to have a long period of uninterrupted, consistent practice by that agency to say, in every case over the past 20 years, you have allowed debt service to be passed. And I know the judge didn't allow some other decisions into evidence, but wasn't that Mr. Goldstein's testimony, that he believed that over a period since he started dealing with the city, debt service had always been incorporated? No, he acknowledged, Your Honor, I believe that at least one case. Well, he acknowledged in his one application that it hadn't occurred. Yes, and I think, so there is, and the cases on which he did purport to rely were hardly voluminous. 70, 80 cases. I mean, this is not a situation in which the agency had always done it this way forever, full stop, in which maybe you could make an argument that that kind of consistent practice could give rise to reasonable expectations. I see, Your Honor, that I'm down under my five minutes, but I'm happy to answer questions right now. I think you can save the rest for about unless Judge Corman has a question. Thank you. Mr. Metlisky. Thank you, Your Honor. May it please the court, Anton Metlisky for Colony Cove. So I wanted to start where you started, Your Honor. Yeah, and let me lay out the question that bothers me so you can respond to it. We know that in order to constitute a taking, a Penn Central sort of regulatory action must, in effect, be the equivalent of eminent domain. I took your property away. We also know that the traditional way of measuring that is value before and value after. I can't find any evidence of value after in this record. So I have two questions for you. Am I wrong in not being able to find it? And if I'm not wrong, isn't it essential? I think you're respectfully wrong about both of those things. OK, so tell me where in this record I can find what the value of this property was after the regulatory actions. So a qualified answer to that, both damages experts testified that calculated damages based on the present value of the amount that wasn't the debt service that wasn't. No, I understand that your damages experts said that the present value of the income stream that we're going to lose is $5 million. So around $6 million. $6 million. I have other questions about that, but put that aside for a second. So if that analysis had been taken out to perpetuity, it would be an analysis of the decrease in market value from the purchase price. And was that analysis taken out to perpetuity? No. And so that value undervalued the decrease in the total value of the property because. It may have undervalued it. It may not have because we all know that loss of income on a property doesn't necessarily mean that there's an equivalent decrease in value of the property. Well, it's not loss of income. It's loss of cash flow. And so this kind of cash flow may or may not decrease the value of a property. Their expert admitted that it did. So that was, I mean, that was a question before the jury. So let's assume that it reduced it by $5 million. Yeah. OK, so. That's not enough, is it? No, Your Honor. And again, I mean, to your first point, I think it is incorrect that the only way to demonstrate economic impact under the first prong of Penn Central is to calculate damage before and calculate damage after. And I'll give you an easy example why that has to be true. So imagine if somebody buys a property and the city says, congratulations on your purchase. Now you have to give me your rental income, all of it. Excuse me, your rental revenue, all of it. You still have to operate the park, but you have to give me the revenue for four years. And then you're going to have the park back after. You're not going to have, you know, 90 percent, 70 percent, or any large percentage diminution in market value, but nobody. Let's assume that for a second. And let's assume that it's legal under a statute of some kind for the city to tax the, well, because you're starting off with a, with an action that would be illegal. Well, no. Now, facially illegal as opposed to as applied illegal. But let's assume that's true and the action is legal and at the end of the four years, the property has doubled in value. Do you have a taking? You may have an illegal action in those first four years by some other virtue, but do you have a taking? So first of all, the premise of all takings claims is that the action is not illegal. If it's illegal, it's another problem, right? That's right. It's public use, taken for public use. So in this circumstance, the change in market value that doesn't, in your hypo, the change in market value that doesn't have anything to do with the government action, I don't think would be relevant because the question is the economic impact caused by the government action is alleged to be a taking. Because the market value can go up and down. Let's take your theory then. The economic impact caused by the action in this case was $3.4 million, the jury said. Well, no, I think the economic, that was the just compensation that the jury calculated, but there was a different economic impact here. What your client lost was $3.4 million. That's what the jury found. Instructed that it had to find a loss in rentals. So you're stuck with that number, aren't you? No, because that is the amount of just compensation required. Economic impact is obviously connected to just compensation. But isn't just compensation the difference between the value of the property before the action and after the action? More or less, but what I'm trying to get at is that economic impact under the first prong of Penn Central does not need to be calculated as a difference in market value. In this case, the economic impact was that because of the city's decision, and in light of the reasonable investment-backed expectations that we can talk about later, Colony Cove was forced to operate this property at huge, over a million dollars in actual cash loss, which I would have put it into foreclosure. Let me treat that issue because it's one I have concern about, and maybe this is a good point to do it. Let's assume a different buyer of Colony Cove who bought it for cash and got exactly the same rent increases that your client got. Would there be a taking under those circumstances? No, but that wouldn't have been. Everybody agrees that there's a stipulation to the fact that this was a market transaction of the financing firms. I understand it was a market transaction. You're answering, with all respect, you're answering a different question than what I'm asking. And you've answered the different question quite well. But the question that I'm asking is, let's assume that instead of your client, we have somebody who bought this park for $23.5 million in cash and therefore had no debt service and applied for rent increases and got precisely the rent increases that your client got. Would that be a taking? No, because all government action, obviously, is subject to Penn Central, but that would not be a taking because there is no reasonable investment-backed expectation. The reasonable investment-backed expectation here was that debt service, mortgage interest, acquisition debt service, would be treated as an allowable expense. There was no acquisition debt service if you buy it for all cash. So that's based on the notion that you had an expectation that debt service would be treated differently. Right, but so if you look at, for example, footnote 7 of the Lucas case in the Supreme Court, the reasonable investment-backed expectations and economic impact are linked because the economic impact always has to be judged against the reasonable investment-backed expectations, right? It doesn't really make too much sense to judge one without the other. And in this case, the jury heard evidence that there was a reasonable investment-backed expectation that debt service would be an allowable expense, mortgage acquisition debt service. All of the debt service? Well, in this case, the evidence was all of it. Nobody ever offered less. There was evidence that in other cases, when there was a large rent increase, the city had offered those people to phase in the increase. That kind of thing was never offered to Mr. Goldstein. So it's not like the city said, we'll give you $100, but not $200 or anything like that. And so the question before the jury. He had an expectation that if he got an $18 million mortgage and he had to make approximately $5 million in payments, he would get that from the board, the full amount. Because the guidelines themselves account for the problem, I think, that you're hinting at, which is that debt service is not an allowable expense if the board finds that the purchase price is too high or if the financing terms are unreasonable. But you agree, as a matter of state law, the board doesn't have to take debt service into account? Well, this is an as-applied challenge. Right, I know, but you know it. So now, of course, they don't have to because they. You've litigated that issue once on the way. The last time up, the argument was they had to. They can't change the law. They had to use the previous guidelines. And you were not successful in that argument. Well, no, Your Honor. In that argument, the question was whether the claim was timely. The claim there was a facial challenge to the 1979 ordinance. But then you went to state court and litigated, too. The state court action was a just compensation action under Kavanaugh to ripen the claim because this court said we had to. But I just want to make clear about this argument about the change in the law. That was not at issue at all in this court's common hope decision. I agree. I'm just saying you were saying, and their guidelines said you should take it into account. And what I'm saying is that's a little bit of an overstatement because what we know from the previous history of this case is that they were entitled. They weren't required under the previous guidelines to take debt service into account. Well, no, I don't think we know that from anything that happened in this case. And we know that they were entitled to use this other method in any event by the time your client made his application. By the time he made the application, that's absolutely right because they had amended the guidelines. But the question here, it's an as-applied-takings case. I know. So I want to go back to investment-based expectations. And I read this whole record. I'm not happy about it, but this whole record. Your client said, I think, two things about investment-based expectations that I want to ask you about. One is that he relied on the Carson-Gardens case to put aside whether or not the judge shouldn't have allowed Carson-Gardens into evidence before the jury. What expectation could he have based on that case? Well, the question in the trial court decision, right? So he was relying on the Superior Court decision. He was just relying on the fact that the California Court had told this board that they had to treat debt service as an allowable expense. But not on the fact that the Court of Appeals said, you probably don't. You just need to, what you need to do is do two analyses and then choose among them. I'm not sure that's what the California, the California, that wasn't really before the court. The question was whether they violated the writ by not doing what the court. Really, so the board said, go back and give them the debt service. And the Court of Appeals said, you don't have to do that. Just make the other analysis. Just to be clear, the evidence of the reasonableness of investment-backed expectations here, there was a lot of evidence, including the testimony of Mr. Freshoff, who was the person, the city witness, who was in charge of rent applications at the time, who said that a reasonable property owner, he testified to this at deposition, it was introduced at trial, that a reasonable property owner at the time of the purchase would have expected that debt service would be treated as an allowable operating expense. Now, the jury, I don't. He gave that testimony at a deposition. Contrary to what he testified, he testified the opposite at trial and then used it to impeach him. Exactly right. And of course, this was before a jury. So obviously, the whole, the reason we were allowed to impeach him with it is because the jury could have believed he was lying the second time. Why was it in front of a jury? I mean, isn't the ultimate issue of whether a taking has a legal issue? I can see why a jury might determine what value was before, what value was after. I can even see how a jury can determine, under your theory of the case, the lost rental income stream. How can a jury balance the three Penn Central factors and decide whether there's a taking? Oh, because balancing of factors is a classic jury exercise. It happens, for example, in excessive force cases. It happens all the time. But they're not asked in excessive force cases to determine whether the nature of the regulation is such that it's a taking or, you know, this is, it's a strange, it's a strange thing in the end to ask them to find, make conclusions of law rather than findings of fact. Your Honor, the Penn Central and this court and every court, I think, that has ever considered a regulatory takings case has made clear that regulatory takings analysis is an ad hoc factual inquiry. Now, I understand, I understand that the jury can be asked to find certain facts. My question is a different one. My question is, is the jury the appropriate balancer of those facts? Yes, absolutely. If there's a Seventh Amendment right. A jury in this case could have found, in your view, that there was no taking. I think in any case that gets to a jury, the jury can go either way. That's kind of the premise of it going to the jury in the first place, of course. But at this point, the standard of review is you have to take all of the evidence in the light most favorable to us, right? We know, we know. So, yes, I mean, if the jury had believed everything the city said, then maybe it could have come out the other way, but that's obviously not the question now. But absolutely, the balancing of an ad hoc factual inquiry, which entails the balancing of various factors, is exactly what the jury is supposed to do. For example. So, okay, I want to go back then. So you take the jury verdict from your perspective as given. You're not attacking us. Are we attacking the jury verdict? No, you love it. It's $3.4 million. Just compensation. Just compensation. For taking of what? Well, it's a regulatory taking, right? A taking of what? It's a regulatory taking of what? Well, the jury found that there was a reasonable investment-backed expectation, which in regulatory taking is jurisprudence, essentially means a property interest that's required to be compensated, right? And they balanced that along with the economic impact, which as I said, was forcing the property owner to basically run this property in a manner that would have led to foreclosure based on a sudden change in the way that... Good, because that's where I was going. So thank you for... Let's assume there was a foreclosure. Okay. Because your client couldn't keep up with the debt service. And at the foreclosure, the creditor bid in to debt. Okay. Which under California law, seems to establish what the value of the property is at the time of the foreclosure sale. Then we would have known your client would have lost $5 million. Correct. So the prop would have lost more than that. There would have been reputational harm and... Yeah, but you don't get reputational harm in Penn Central cases. No, no, I'm just saying that... Nobody took his reputation. No, I'm just answering that question because the reason that he put in his own money to keep on running this property... Yeah, but we're not a jury. Is because he didn't want foreclosure. We're not a jury. So focus on my question for a second. Sure. So if you assume the property was worth $23.5 million before, which he would have paid for it, and that at the foreclosure sale, forced by the city's action, it was worth 17 million. Because the bank bid in the credit bid. Would that be a taking? I mean, it would be subject to Penn Central, but I think there would be... But our case law says you need a reduction in the value of the property, somewhere in the area, much greater than that in order to qualify under the first prong. No. What your case law says is that diminution of value by itself is not enough. You have to balance it against the other factors. That's the question I asked your colleague. Doesn't, you know, it's another initial case, but it's the city of San Rafael. Doesn't the city of San Rafael suggest that failure to meet that first prong on its own is fatal to the case? I mean, there are all sorts of summary judgment cases where maybe that can be true. But in San Rafael, there was also no reasonable investment backed expectation. Oh, no, I understand there was none, but I read the opinion in that case, and it says, you can't show me a bigger impact on your property than, my God, it was 70, 92.5, 75% at the bottom. And CCA, which is the federal circuit case, no case in which a court has found a taking in which diminution of value was less than 50%. Right, and CCA is a great case because CCA, the whole point of the CCA opinion was that in fee simple cases, you don't only have to show diminution, or diminution of value is not the only way to show a negative economic impact. For example, because the city can just essentially do the equivalent of taking the property for several years, and you would never have regulatory taking. And CCA is one of the cases I'm struggling with because CCA says, look, you can have a taking based on something less than taking away the whole property, but you gotta show a diminution of value of more than 50%. No, no, no, that's not what CCA says, is that in this particular HUD regulatory scheme that's at issue in the federal circuit, they're bound by a previous decision, but the property interest there was a contractual interest about the type of mortgage you were allowed to get. So it had nothing to do with this kind of- I know, and I misdescribed the case to you, Kyle. So it had nothing to do with this, but what CCA was saying said that in this, it was describing as a hypothetical this kind of case where you had a fee simple and you were getting rental income, and they said you don't have to show a diminution in value. That is not the only way that you can show a negative economic impact to satisfy the first prong. Because as I said, if that were true, then again, the city could do the equivalent of just taking away the property for two years. They could say, we're now changing our regulations such that you have to pay us everything you make. And it would never be, as a matter of law, under their theory, a regulatory taking, when in fact, the right analysis is, as in every Penn Central case, to balance the factors. And so in San Rafael, the problem was there was no reasonable investment back- In the Lake Tahoe case, we said, or the court said, Yeah. It's a good we. The court said, you can tell somebody they can't use their property at all for five years. The court did not say that. The court said that that wouldn't be a per se taking. That wouldn't be a taking. A per se taking, but the precise holding of that case is it would be subject to Penn Central. That's what we're saying. We're not saying this is a per se taking. We're saying it's subject to Penn Central as in every regulatory takings case, right? So I think Tahoe Sierra supports us completely. Tahoe Sierra does not hold that the equivalent of a temporary physical taking isn't a regulatory taking. It just says it doesn't fall under the per se rule of Lucas, but you have to do the Penn Central analysis. And again, I think the jury is clearly the right body when you have a Seventh Amendment right to balance these factors. It's true that a lot of cases- Do you have a Seventh Amendment right to balancing the factors or do the jury finding facts? Well, balancing the factors is a fact finding. It's just like in the excessive force cases. I would love to read you this quote from this court's cases about what is required of the jury, a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. That's no different in kind than what's required of a jury in a Penn Central case. There are all sorts of reasons that a lot of these cases don't end up before juries. For example, as you know from the briefing here, they're almost all in the federal circuit because cases against the United States end up in the federal circuit. There's no jury right. There might be cases against the state when there's no jury right. There might be cases that are litigated in state court when there's no jury right. But in the sliver of cases that do end up in federal court and are properly ripened and are under Section 1983, the square holding of Del Monte is that you have a Seventh Amendment right. And then the question is, is this a purely legal question that is left for the court? Or is this a question of the kind of question that is answered by the jury? And the weighing of factors, the weighing of values, the balancing of factors, as in the excessive force cases, is quintessentially a jury question. You're running out of time, and I do have one other question I wanted to ask you. And I think your argument today reinforces it, so I just want to make sure I understand your position. Your position is that a taking under Penn Central, it has applied taking, can be demonstrated by showing a loss of income Well, it's not that it can be demonstrated. Not conclusively. I'm saying that the economic impact factor can, but... No, it's one question, and you're running out of time. So I want to make sure I understand your position. Because as I read this record, all it shows is a loss of income. And so my question is, is that enough to... In the case, the other side's position, it only shows a loss of income you lose. So my question is, your position has to be, it's enough to get me past the first prong of Penn Central. Well, as I said at the beginning, there was a discounted cash flow analysis, so it also showed effect on market value. But the answer to the question is yes, and if I can just elaborate for a quick sentence, is a loss of income by itself may not be enough. But here, the loss of income threw the property into huge losses, right? The question is, was it commercially impracticable to run it, as the Supreme Court said in Keystone, by two minutes? And the answer is yes. The only reason it was able to keep running is because the owner of Colony Cove put in his own money. Thank you, you've run out of time. Judge Corman has a question. I just wanted to ask you about several statements that are made in this city's brief. First of all, they say there were at least two occasions where they did not take into account interest, debt expenses, prior to the purchase, your client's purchase. And they say that Goldstein's own attorney and real estate consultant, Richard Close, warned Goldstein while we were considering purchasing the park that the seller's revenue projections for the park were unrealistic because they assumed a massive increase that the board was unlikely to grant. And he wrote that the seller's, and I quote, income projections and treatment of the city rent control law is false and misleading and failed to disclose several key issues in income projections and pitfalls that a new owner would likely face. He concluded in no uncertain terms, in our opinion, a purchaser should not rely on collecting any increased rents from those currently collected. Right, and so just to start with the second part first. Well, I know we discussed a lot, but a lot of your argument, it seems to me, turns on this reasonable reliance. Right, and so the testimony at trial, which again, the jury was entitled to credit, was that that letter was written for negotiation purposes. That point is corroborated by the fact that the letter was given to the seller, right? And the fact that the purchase price was reasonable or that the expectation that debt service was reasonable is corroborated by the fact that there were two other bids at around the same price. If it's true that the expectation to that debt service would be allowable was priced into the purchase price, then the reasonableness of that expectation is corroborated by the fact that two other people in the market, in arm's length transactions, must have believed it too. Well, they may not have leveraged it in the way that your client did. And without that heavy leverage, they would have operated at a profit. In fact, as of 2009, after your client refinanced, he was operating at a profit. Well, Your Honor, it was a stipulated fact in the record, and it's also undisputed in the testimony that this is a commercially reasonable financing arrangement. And if it weren't commercially reasonable, if the board had thought that the debt service was too high, then there's testimony in the record from Mr. Freshoff that they would have said, you know what, we're not treating debt service as an allowable expense because it's too high, because the financing terms are unreasonable. They didn't say that. Well, it may be from the standpoint of the purchaser, but the board also has to take other factors into account. He could have, in terms of how much of the net, his debt payments, it wanted to compensate him for what he owed. Well, no, I mean, I guess I'm just disagreeing with you a little bit in the sense that under the guidelines if the board thought the debt was too high, right, then it could have said, we're not passing it on because you took on too much debt. You shouldn't have bought this property. That was an unreasonable thing to do with taking on too much debt. They didn't say that. They didn't say that the financing terms were unreasonable. What they said was, we're just not taking debt service into account. I wanted to answer your other question. There were two small parks. I think they were around 2004. Mr. Goldstein testified that he wasn't aware of them because they were small. And so he wasn't paying attention to them. From my reading of the record, he knew what was going on in the mobile home business in this area. But what he knew, also knew, I mean, there was testimony in the record that he didn't know about this. I mean, the jury was allowed to credit that, but what he did know was that contemporaneously, a court had said, you can't do that. That's it? No, no, no. I mean, there's other testimonies. But contemporaneously, a court had said, which a lower state court had said, that's it? Well, that's not it. I mean, again, so their witness testified that it would have been reasonable to take, for a property owner at the time, to understand, to expect, that debt service would be allowable. And again, we're not talking about a guarantee. And all of the debt service would have been allowable. Notwithstanding the staggering increase that was required, that was far more than was ever, that the city had ever granted. There was testimony in the record that in other cases, the city had mitigated large rent increases by, for example, phasing them in over time, and they never gave Mr. Goldstein that option. They allowed him to turn this into a condo. They gave him additional uncontrolled spaces. Right, and so. And they allowed him to, my recollection is they allowed him to, they also allowed in this increase for improvements, I think, that had been made by the prior owner. I'm not sure that last part is true. Most of the rent increase, most of the rent increase that was granted in the first year was to pay for increase in property taxes. The, and so, I mean, I'm sorry, you had a question before that, didn't you? I don't think I did. I have one after. Oh, okay. I'm not an economist either. But in 2009, the place was operating at a profit. I think it was 2011 after there was, after refinancing, after the market, post-financial crisis, the interest rates had dropped. Profit. After he was able to refinance, sure. But the economic, that affects the economic impact prong. And the way you judge economic impact of a government action is the economic impact caused by the government action, right? And so the fact that he was able, market forces had changed five years later, and he was able to get out from under the loss that the government had itself caused is not a reason to say that there's no taking because otherwise it would create an incentive for property owners never to take advantage of changes in market forces. Otherwise they would lose their taking. But he said he bought for the long-term. He wasn't, he was not necessarily for the short-term. And in the long-term, this, I assume, turned out to be a good investment. That was saying what happened. I don't know whether in the long-term it turned out to be a good investment or not. That's not in the record. What is in the record is that compared to his reasonable investment-backed expectations, which was that he would be able to pass, you know, treat debt service as an allowable expense, he wasn't, and thus was forced to run the- The only reason- Was he expected to be able to get a $600 a month increase, which is what he originally applied for? The only reason he even made it to 2011 was because he was putting in his own money to make up for the millions of dollars in cash losses that he had to operate under so that he wouldn't be foreclosed against. Let me, you've gone way over, and I don't want to cut Judge Corman off, but his, because I want to ask a question based on his questions, and I want to refine the question I asked you before. Let's assume no investment-backed expectations. In other words, you just come to the city and you buy a mobile home park. Yeah. And you buy it with, in a commercially reasonable transaction, exactly like this one. Yeah. And the city gives the rent increases that it gave. Would that be a taking? I mean, it would, again, be subject to- No, no, no. But I think it would be a very difficult- Otherwise, no investment-backed expectations. Otherwise, exactly the same as your case. It would be very difficult. I would assume- Could it go to adjourn? I doubt it. With no investment-backed, let me caveat it with one point. Under this court's decision in Guggenheim, the court said that even if an expectation is sort of, wouldn't otherwise be reasonable if it has a substantial effect on the market price, if a subjective expectation- But I'm trying to withdraw all expectations. Somebody just comes to- But no expectation at all. Comes to the city, says, I have no idea what this board is gonna do or hasn't done. I've financed this property this way. And the board says, here, okay, here's your rent increases. And those increases lead you to operate at a loss. Right. You would agree that's not- I doubt that that would get to a jury, yes. You can't get that one to a jury. I think that would probably be a summary judgment case. So your case depends, at least in part, on whether there was sufficient evidence to go to the jury of reasonable investment-backed expectations. At least in part, sure. I mean, yes. Because it strikes me in whole. Well, I think it's an important factor, for sure. There's no question about that. But this, just to be clear, this is not a case where there was no expectation. Nobody even argues that. Everybody agrees that there was, at least nobody disputes that there was a subjective expectation. The question is whether it was an objectively reasonable expectation. And their own witness testified that it was. Even under the other standard, the non-NOI, under the guidelines it said they may take it into account. Didn't they, or am I mistaken? Well, two points about that. The guidelines said they told you when they could and when they should and when they shouldn't. When they should is when the purchase price was reasonable and when the financing terms were not unreasonable. I thought as I read it, and I could be wrong, it said they may take it into account if certain conditions are met. They didn't say they must take it into account if certain conditions are met. I think that, I mean, those are the words. I think it's a little bit ambiguous, but the point is this was an as-applied takings challenge. They may do it if certain conditions are met. And you say that means they must do it? No, I'm saying this is an as-applied takings challenge. And I think the question is whether it was reasonable to believe that given the guidelines, given the way that the city had operated, and given their own witnesses' testimony about what a reasonable owner would have expected, that the jury could have found that there was a reasonable investment backed expectation. The jury was required to weigh that against the other factors. And the jury was entitled to find a taking here. And tell me again why it wasn't reversible error to have the jury evaluate the lower court decision in the first case. Oh, because it was direct evidence of both the existence of an actual expectation and of its reasonableness. I mean, and the judge gets to weigh, you know, whether there was any unfair prejudice, but there wasn't unfair prejudice, because again, it's direct evidence of the reasonableness and the existence of the expectation. It would be hard to understand how that question could be litigated without the decision since Mr. Goldstein testified that he relied on it. Well, what I don't understand is that he relied on anything other than the fact that the city hadn't taken an appeal and it's arguable that decision was correctly decided. Are people supposed to argue to the jury this question? And would he have relied on a, is he a lawyer? He's not a lawyer. So he presumably would have consulted with counsel when he relied on that case, or he didn't? I'm not sure, but again- Oh, so he relied on it without consulting counsel. So he relies on a case that doesn't really support the proposition that you're arguing for and without consulting a lawyer. Well, Your Honor, that argument could have been made to a jury. Okay. Thank you. We've taken you over, but we, for good reasons. Thank you, Your Honor. Why don't we just put five minutes on the clock and Mr. Zinn, if we're still bothering you at the end of the five minutes, we'll keep extending it. Okay, thank you, Your Honor. If there's only one point I can make in my five minutes, it's this, it's to take my colleagues hypothetical about the situation in which there's an owner of a mobile home rent park and the city decides that the city is going to appropriate the rents that are coming in from that. What's the property being taken in that case? In that case, I- Isn't the property the rents? It's the rents, yes, but- As opposed to the fee simple interest in the property. Yes, that's correct. But I want to make clear here, why would that be a taking? The reason is because there would be a reasonable investment-backed expectation of receiving those rents. It's like expecting rent to be paid, which is what this court said in Guggenheim, is the test for- So their argument is we expected rent to be paid in a much higher amount than it was because Mr. Goldstein's expectation was based on history and everything else that bigger increases would be given. So why is that hypothetical different in this case? Because that increase is exactly hypothetical. In the situation where you have a taking of actual rent, it's rent that they had a legal entitlement to already. So in this case, there was no legal entitlement. One of the difficulties I was having with the analysis of that is it's probably not a Penn Central taking. If you're taking somebody's, the property that you're taking you're actually exercising eminent domain over some intangible property that already exists. Where here we're talking about property that someone expects to come into existence. Exactly. Although there is still an expectation in that case because the expectation is that rent will be paid, right? It's an expectation that's based on a contractual agreement and the law of contract that makes that contract enforceable. But the amount of rent that's expected to be paid is fixed. Yes, it's concrete, it's fixed. There is a legal entitlement. Let's get back to this case and see if you can deal with the argument that your colleague makes. Your colleague says, well, we had a reasonable, we at least had enough evidence to go to the jury about a reasonable investment expectation. And for better or worse, the jury must have found in our favor because they were told they had to find one in order to find it in our favor. And that means that $3 million stream, if you have the income that we lost over the time period, net income that we lost over the time period, was taken from us. That's their, I mean, I don't think that's an unfair characterization of their argument. Respond to, what's wrong with that? Well, because, Your Honor, in the C-10 case that the CCA case followed says, you can't just look at that in isolation. You have to look at the entire income stream from the property over the useful life of the property. You can't just look at an isolated window, a snippet of time and say that income was taken without the context. We have no way of knowing how severe that is. I mean, that's the core, as we've talked about, the core of the regulatory takings analysis is how severe is this impact really? And in order to do that- So do they have to come back each year and make the claim until we're far enough down the road to know that the property has been completely devalued? No, Your Honor, because you can, I think the fact that the city has already denied it was sufficient to say, I mean, we wouldn't say that they had to assume that the city was going to go ahead and grant that increase in the future. I think that's a safe assumption that that was not gonna happen. But the question is, so is that, three million sounds like a lot of money. It's certainly a lot of money to me, but how do you judge whether that impact is so severe as to be the functional equivalent of ouster just by looking at that number? So your argument is that one cannot focus simply on the lost income. One must look at whether the value of the fee simple has been reduced. I think, I mean, that's the simplest way to do it is because that value brings all of it. Your colleague says it's not the only way to do it. Right, but the other way to do it is not just to look at one item of potential income in isolation. It's to look at the income stream from the property projected out over its entire life. I thought that's what their expert did. Their expert said, here's our expenses. Here's our projected expenses. Here's our, one of the projected expenses, of course, was debt service. That's exactly right. And that was what they took in isolation. That's where the 5.7 million number comes from. That is the hypothetical income that they say they expected to receive over, it's over about, I think, an eight year period. And then they discounted that to present value. It was just the debt service, nothing else. That's right, and no, not the revenue, nothing else. So there was no context for that. But I just want to emphasize, Your Honor, that what this was is unlike the expectation of rent being paid. This was an expectation of getting a rent increase that they had no entitlement to. And in the CCA case and those Sienega cases, which are humbling to try to get through, I have to admit, those cases involved contractual entitlements. There was no contractual entitlement or statutory entitlement to receive this revenue. But that's what makes this an as-applied case. I don't see how that changes. If the statute gave them the right, we'd be dealing here with a taking, or a contractual right, it would be the contractual right that was being taken. See, that's one of my difficulties with the, what's being taken is not an interest in the fee simple, but the contractual right. One can value the contractual right. And we don't have that in this case. What I'm struggling with is what's being taken, is what's precisely being taken. I agree, and I think that there are two possibilities, and one is the fee simple. That's recognizable property. And under that one, there's no evidence of reduction of value of the fee simple. And the other candidate is this hypothetical, isolated debt service. But there's no basis for considering that to be property in isolation. Because there's no contractual entitlement to it, there's no entitlement of any kind that would say that money is discrete property, as opposed to a speculative strand in the bundle of their real property rights, which is really what it is. Does this all come down essentially to believing Mr. Goldstein without any corroborative evidence about what his expectation was? I think our position is not based on that, Your Honor. I think yours, but I mean, in the end, the jury, there were other instances where the board used the NOI method. They didn't give him, take that into account in his first application when he bought property. His lawyer writes a letter, which if you believe them was fraudulent, says that, don't expect that you're gonna be able to get this increase. So what this, and there is this opinion of a state court, lowest state court judge, which Mr. Goldstein is not even a lawyer, and we don't even know whether he consulted a lawyer about. And this adds up to a reasonable expectation. That is their contention, Your Honor. I can't see how that's possible, but. We've taken you over, not as long over as we took your colleague, but I think we now have a full grasp of both sides' arguments. I wanna thank both sides for the excellent briefing in this case and the excellent arguments, and this case is submitted. Thank you very much, Your Honor.
judges: Graber, Hurwitz, Korman